Samuel P. TORRENCE, Jr., Plaintiff,

v.

OXFORD MUNICIPAL SCHOOL DISTRICT, and its Board of Trustees, in their individual and official capacities, Gene Meadows, in his individual and official capacity, and Terry Mood, in his individual and official capacity, Defendants.

Civ. A. No. WC83–6–WK–D.

United States District Court, N.D. Mississippi, W.D.

Aug. 1, 1985.

Richard B. Fields, Memphis, Tenn., for plaintiff.

S.T. Rayburn, Will A. Hickman, Oxford, Miss., for defendants.

## MEMORANDUM OF DECISION

KEADY, District Judge.

On January 12, 1983, plaintiff, Samuel P. Torrence, Jr., a black, sued Oxford Municipal School District and its Board of Trustees, Gene Meadows, Superintendent of Oxford School District, and Terry Mood, Oxford High School principal, defendants,[1] to redress claims of racial discrimination in employment practices. Federal jurisdiction was founded on 28 U.S.C. §§ 1331, 1343(4) for causes of action arising under Title VII, 42 U.S.C. § 2000e–5f(3), and 42 U.S.C. §§ 1981 and 1983. Plaintiff sought back pay, punitive damages, reinstatement, and attorney's fees and costs. Defendants denied the allegations of the complaint and, in turn, moved for an award of attorney's fees against plaintiff for defending the action.

After discovery and pretrial conference, the parties entered into a stipulation of facts contained in a pretrial order dated October 17, 1983. The court conducted an evidentiary hearing on July 29 and 30, 1985, at which time the parties appeared personally and by their attorneys, offered oral and lengthy documentary evidence, and the court heard oral argument of counsel. Being duly advised in the premises, the court now makes findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P., as follows.

1. All individual defendants are sued both in their individual and official capacities.

2. The signers of the petition were parents of white high school students, including Mrs.

### I. *Findings of Fact*

1. Plaintiff, the holder of bachelor's and master's degrees in music education, was first hired in 1961 by the defendant board as band and music director of the all-black Central High School. With the advent of desegregation in 1970 of the Oxford public schools, plaintiff in the years following held the positions of assistant band director, and band director of Oxford Junior High School. In 1976, he was assigned as the assistant band director of Oxford High School. In the fall of 1979, plaintiff was appointed high school band director on the recommendation of Superintendent Gene Meadows, but he was not recommended for re-employment at the end of the 1979–80 school year. This action was the result of recommendations by Superintendent Meadows and Terry Mood, the Oxford High School principal.

2. In January 1980, dissatisfaction with the high school band surfaced when a number of parents petitioned the school board expressing concern about the reduced numbers of junior high school students entering the high school band, the low ratings given the band at state contests, and the apparent lack of enthusiasm and pride of students in being band members. The patrons called upon the school board to take appropriate steps to assure that the band program was of proper quality.[2] In April 1980, pursuant to plaintiff's request, hearings were held before Joseph Blackston, University of Mississippi professor named by the school board to take evidence and make recommendations regarding plaintiff's further employment as high school band director. On July 3, 1980, Blackston rendered a report (P.Exh. 5), summarizing the problems facing the high school band, the past conflicts, weaknesses, and experience during the years that plaintiff had served as band director. Blackston made specific recommendations as follows:

Snavely, the wife of Luther Snavely, University of Mississippi band director, who later testified against plaintiff in the 1980 hearing before Professor Blackston.

1. A clearly defined job description for the position should be formulated by school officials, the band director and experts in the music field.
2. Written evaluative procedures should be established and adhered to.
3. An assistant band director should be employed with clearly defined duties.
4. Adequate financial budget should be provided.
5. A public relations program should be supported by all school personnel.

Blackston concluded his recommendations by stating "I do not know if Samuel Torrence can succeed as band director at Oxford High School. He should be given the opportunity, as suggested above. If, given the proper opportunity, and he cannot succeed, then his services should be terminated."

3. On July 8, 1980, the board, acting on Blackston's recommendations, employed plaintiff as high school band director for 1980–81. During the next two years, plaintiff served as high school band director, each year receiving the recommendation for re-employment by Superintendent Meadows and Principal Mood. All of Blackston's recommendations, however, were not immediately carried out. The job description and written evaluative procedures were promptly established. Although seven applicants were interviewed, school officials were unable to employ an assistant high school band director until the fall of 1981, when Mrs. Rebecca Snavely was employed. Plaintiff objected to her appointment, even though she was qualified for the post, and recommended Ken Lewis, who was approached by the administration but was unavailable. There was also a delay in obtaining new band uniforms. In due course, the band's budget was increased and a public relations program was placed in effect by school personnel.

4. Despite these steps to improve the band program, problems developed from disorganization in planning the program, training and teaching band students. Further, there was a lack of proper discipline and a failure of communication between the band director, the students and parents as well as other school personnel. The statistical record for the three-year period showed student participation in the high school band progressively declining, with extraordinary dropout rates of 73% in 1979–80, 80% in 1980–81, and 86% in 1981–82. According to credible testimony, the dropout rate should not exceed 20%, or at the most, 30%. During each of the years that the Oxford High School band, classed as a BB band, attended state contests, it performed unsatisfactorily. For example, in 1979–80, it scored, on a scale of I to IV, with I being superior and IV fair, a III in concert, III in sight reading, and III in marching. In 1980–81, the band scored IV in concert, III in sight reading, and IV in marching. In 1981–82, the scoring was the lowest grade of IV in each of the three categories. At the same time, individual members performing solo or ensemble work were rated either superior or excellent.

5. On April 1, 1982, Principal Mood advised Superintendent Meadows of his decision not to recommend plaintiff for continued employment, stating that he had observed plaintiff's performance during the past three years and that his continued employment would not be in the best interest of the band program or the school as a whole. On April 6, 1982, Superintendent Meadows advised the plaintiff that he would not be re-employed for the 1982–83 school year and stated that plaintiff, upon his request, was entitled to a hearing before the school board. Plaintiff engaged an attorney who requested a hearing and a list of the reasons for the non-renewal of plaintiff's employment. This information was provided. On May 6, 1982, the school board conducted a hearing at which testimony was given by plaintiff and witnesses in his behalf and by Mood and Meadows. After full hearing, a transcript of which has been received into evidence in this court, the school board upheld the non-renewal of plaintiff's contract. On June 4,

1982, he was notified of this decision which was based upon the following reasons:

1. Having been band director for three years the band program under your direction is progressively declining each year in interest, student participation and quality of performance;

2. Disorganization in planning, direction, teaching, grading and classroom work;

3. Lack of consistent and effectual discipline;

4. Failure to create and maintain good rapport and communication with students, parents, faculty and community;

5. Lack of cooperation with faculty and administration; and

6. No substantial improvement in the band program after three years is evident and no underlying factors exist that might form a firm basis for expected improvement to make the Oxford band program competitive with surrounding bands in Mississippi.

P. Exh. 11.

6. On June 14, 1982, plaintiff filed a charge of racial discrimination with the Equal Employment Opportunity Commission (EEOC) stating that the Oxford school system had discriminated against him because of race and also because he had filed a previous EEOC charge in 1976, upon his failure to be promoted at that time to the position of high school band director. Although plaintiff subsequently withdrew the 1976 charge, he felt that continued harassment had resulted because of the previous filing and "has finally culminated in my discharge." (P. Exh. 1). On October 26, 1982, EEOC determined there was no reasonable cause to believe plaintiff's allegations were true and dismissed the charge. On the same date, notice of the right to sue was issued to plaintiff. The present action followed.

7. Upon the recommendation of Mood and Meadows, the school board employed Badrae Hannah, a black, as high school band director for the 1982–83 school year. Hannah, who had been employed at d'Iberville High School, was highly qualified for the position; under his directorship the Oxford High School band showed marked improvement at the state band contest, scoring II in concert, I in sight reading, and II in marching. During the three years that plaintiff was band director, Oxford High School had an enrollment of more than 550 students, 35% of whom were black. Blacks composed 28% of the high school faculty and staff. For the district as a whole, black enrollment was 40% and black faculty and staff was 28%.

At trial, plaintiff testified that his employment was not renewed partly because of the band's deficiencies in marching and the low ratings received at the state contests. Also, he felt that he was discriminated against on account of race, a feeling based upon objections made by parents of white high school students. Plaintiff acknowledged that there had been a decline in student participation in the band during the three years of his directorship but attributed the decline to factors beyond his control, such as scheduling problems, community unrest, unjustified criticism, and lack of communication between him, the students and the community. Plaintiff's witnesses, William McCune and Debra Gibson, who had been members of the Oxford Junior High School band when plaintiff served as the director, were supportive of plaintiff's efforts and regarded him as an effective director and a positive influence for student development. In opposition to this testimony, Mood and Meadows, both in this court and at the 1982 school board hearing, testified that plaintiff's contract was not renewed because of his unsatisfactory performance. They detailed a multitude of problems which plaintiff encountered in organizing the band program and his failure to coordinate individual efforts into an effective group. Further, they stated that he was inconsistent in dealing with students in discipline and grading practices and that under plaintiff's directorship the band performance had steadily declined, reaching the lowest possible rat-

ing in all contest categories. Mood testified that he was confronted with a constant flow of students wanting to drop out of the band and that he spent a great deal of time in encouraging them to stay in the program. During many conferences with plaintiff about the problems in the band department, Mood found him to be hostile to suggestions. The principal documented many instances of chaotic conditions when the band marched in public and found that plaintiff had poor rapport with his students, often directing them to do things without explanation. Also, plaintiff's failure to maintain correct discipline in the bandroom was most unsatisfactory. Principal Mood stated that he had recommended Torrence in prior years since it had been determined that he should have three years to establish a good band program, but that plaintiff's performance had not improved. Superintendent Meadows testified that the primary reason for the non-renewal was the steady decline in student participation and performance of the band. Secondly, he attributed the non-renewal to a decline in band ratings at state contests where the comments of adjudicators showed that there was no improvement from one year to the next. A third reason was the unfortunate disorganization in plaintiff's planning of an instructional program and his inconsistent grading and teaching. A fourth reason was excessive disciplinary problems that plaintiff had with students. Finally, Meadows was of the opinion that the cause of many complaints he received from parents about lack of planning and coordination in the band program was that plaintiff had no rapport with the community. Meadows agreed with Mood in stating that they had seen no indication of improvement in the band program during the three years that plaintiff had been the band director and that since there had been a steady decline in student participation and band performance, plaintiff's contract should not be renewed. Both specifically denied that their recommendation was racially motivated. Meadows stated further that he frequently counseled with plaintiff about the band problems and gave suggestions on ways in which the administration might assist. These counseling sessions were held when plaintiff was first employed as high school band director and they continued each year. The superintendent stated that he was unable to communicate with plaintiff, who was more interested in justifying his actions than in seeking solutions for an improved band program.

8. The court finds as a fact that the non-renewal of plaintiff's contract in April 1982 was, in fact, based upon plaintiff's unsatisfactory performance as band director and that the reasons proffered by the school board in its June 4, 1982, decision are supported by substantial evidence. The court further finds that plaintiff abandoned any claim that the school officials retaliated against him because of his previous filing of an EEOC charge since he gave no testimony to that effect either at the board hearing or in this court. In any event, there is no factual basis for a claim of retaliatory conduct. The court further finds as a fact that the recommendation of Mood and Meadows not to hire the plaintiff and the school board's decision upholding such recommendation was not in any way racially motivated.

9. Although the court was impressed with plaintiff's dedication to music and the earnestness of his manner at trial, nonetheless his inability to develop a high school band that could effectively function, after having three years to achieve such a result, justified the school board in discontinuing his further employment. It is not for this court to say that plaintiff should have been given more time to reach the objective that he and the defendants desired. Suffice it to say that the non-renewal was not actuated by racial considerations and was within the discretion of school officials which this court is bound to respect.

## II.  *Conclusions of Law*

1. In a disparate treatment case involving a discharge situation, a Title VII plaintiff carries the initial burden of establishing a prima facie case of discrimination.

See *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). Generally, the plaintiff must show that "(1) he belongs to a group protected by the statute; (2) he was qualified for the job from which he was suspended and not re-hired; (3) he was terminated; and (4) after his termination, the employer hired a person not in plaintiff's protected class, or retained those, having comparable or lesser qualifications, not in plaintiff's protected class." *Whiting v. Jackson State University*, 616 F.2d 116, 120–21 (5th Cir.), *reh'g denied*, 622 F.2d 1043 (5th Cir.1980). However, this four-part test is not the exclusive method by which a plaintiff may make prima facie proof of discriminatory discharge. *Byrd v. Roadway Express*, 687 F.2d 85, 86 (5th Cir.), *reh'g denied*, 691 F.2d 502 (5th Cir.1982). The basic inquiry is whether or not one can infer from the employer's actions, if unexplained, that those actions were based, more likely than not, on illegal discriminatory factors. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (quoting *Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977)).

■ Once a plaintiff has established a prima facie case, the defendant must attempt rebuttal by clearly articulating a legitimate, nondiscriminatory reason for the employment decision. *Sanchez v. Texas Commission on Alcoholism*, 660 F.2d 658, 660 (5th Cir.1981). A defendant does not bear the burden of persuading the court that he was actually motivated by the proffered reasons; rather, an employer need only raise a genuine issue of fact as to whether there was illegal discrimination involved in plaintiff's discharge. If an employer satisfies its burden of production, the burden again shifts to the plaintiff to prove that the proffered reasons are not merely pretextual. *Id.* at 660–61.

■ When Title VII and 42 U.S.C. § 1983 are used as parallel remedies in a disparate treatment suit, the same substantive elements are applicable for recovery under both statutes. *Nilsen v. City of Moss Point*, 701 F.2d 556, 559 n. 3 (5th Cir.1983). The same principles also apply when Title VII disparate treatment claims are brought in conjunction with claims under 42 U.S.C. § 1981. *Adams v. McDougal*, 695 F.2d 104, 109 (5th Cir.1983).

■ 2. In the instant suit, we conclude that plaintiff did present a prima facie case of disparate treatment as defined under Title VII. However, upon defendants' articulation of legitimate, nondiscriminatory reasons for non-renewal of Torrence's contract, the presumption raised by the prima facie case disappeared. The court holds that plaintiff did not carry his burden of demonstrating that those reasons were a mere pretext, either by casting doubt on their truth or by proving that a discriminatory purpose more likely motivated defendants' decision. Substantial evidence supports the finding that plaintiff's non-renewal was because of his unsatisfactory performance. Therefore, plaintiff is not entitled to recovery under Title VII.

3. Upon plaintiff's failure to prove pretext under Title VII, we must also conclude that no recovery is available under 42 U.S.C. §§ 1981 and 1983.

■ 4. Defendants moved, in the event that judgment was granted in their favor, that plaintiff be required to pay their attorneys' fees and expenses pursuant to 42 U.S.C. § 1988. The motion is not well taken and is denied. Mr. Torrence's suit was not frivolously brought. To the contrary, it was brought in good faith, and plaintiff was able to make a prima facie case pursuant to Title VII and 42 U.S.C. §§ 1981 and 1983. *See E.E.O.C. v. Christianburg Garment Co., Inc.*, 550 F.2d 949, 951–52 (4th Cir.1977).

Let an order issue accordingly.